UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JIONGSHENG ("JIM") ZHAO | No. 18 CR 24<br>Judge John J. Tharp, Jr. |

**DEFENDANT JIONGSHENG ZHAO'S**
**POSITION PAPER ON SENTENCING**

Defendant JIONGSHENG ZHAO, by and through his attorneys, THEODORE T. POULOS and EMILY C.R. VERMYLEN, respectfully submits the following Position Paper on Sentencing.

## I. INTRODUCTION

Mr. Zhao is a hard-working, kind, and decent person. Having immigrated to Australia from Shanghai at 9 years old, he and his family were proud of their roles as productive citizens in their adopted country. Mr. Zhao fulfilled his immigrant parents' dreams by earning a college degree and obtaining steady employment as a trader. By all accounts, Mr. Zhao was the pillar of his family, the trustworthy and responsible son who repaid his parents' sacrifices in many ways, including through his devotion to them in their old age. Indeed, the letters attached to this submission, authored by those who know him best, attest to Mr. Zhao's good character, his commitment to his work, and his undying devotion to his parents, and his fiancé and friends. As Mr. Zhao's fiancé, Julie Wang, explains:

> Jim is a quite detailed person who has never crossed the law boundary. This can be demonstrated from small matters such as paying the bill on time, good driving history record and so on. Honesty is his primary principle when dealing with friends and business partners, he once told me that one thing money can't buy is trust.

(Ex. B, Julie Wang Letter to the Court at p. 1).

Unlike other spoofing traders who have been prosecuted in this District and elsewhere, Mr. Zhao's offense conduct was not motivated by greed and, thus, resulted in minimal profit to himself and his employer. Indeed, by the government's own calculation, Mr. Zhao's spoof orders generated a mere $21,000 in trading gains over a period of almost three years, from June 30, 2013 to March 7, 2016. That's because Mr. Zhao did not engage in spoof trades to enrich himself;

rather, he merely used it as a strategy to quickly unexecuted a large trading position in order to leave his desk at lunchtime or at the end of the day.

Mr. Zhao has already been severely punished for his offense conduct. He spent ten frightening months in detention in Australia while awaiting extradition to the United States. During his detention, Mr. Zhao was locked in his cell for 17 hours a day – a cell he shared with threatening strangers. He was separated from his fiancé and parents. He had no idea when he would be extradited or release. When he finally arrived in the United States on November 16, 2018, he was held in the MCC for ten excruciating days and then placed on home confinement and required to remain in a hotel room until December 26, 2018, when he pled guilty and was permitted to return to his family in Australia. Mr. Zhao's detention in Australia and subsequent extradition will forever remain the worst days of his life.

Immediately upon his arrival in the U.S., Mr. Zhao fully cooperated with the government, promptly accepted responsibility for his conduct and pleaded guilty to one count of spoofing in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2). He now anxiously awaits the judgement of this Court.

As set forth in Mr. Zhao's plea agreement, the parties agreed to jointly recommend that Mr. Zhao be sentenced to a period of one year and one day imprisonment, with credit for time Mr. Zhao already served in United States and Australian facilities. The agreed sentencing recommendation in essence contemplates that with credit for time served Mr. Zhao would not have to serve any additional period of incarceration and would be allowed to return to Australia to rebuild his life and continue caring for his parents and fiancé. We, therefore, appreciate and applaud the Probation Office's recommendation that a sentence of time served is appropriate in this instance.

## II. MR. ZHAO'S PERSONAL CHARACTERISTICS AND BACKGROUND

Jiongsheng Zhao is now 32 years old. (Presentence Investigation Report, or "PSR," at 3). He was born in Shanghai, China, where he lived with his parents until the age of 9. (PSR at 10). In 1990, Mr. Zhao's father immigrated to Sydney, Australia and six years later, in 1996, when Mr. Zhao was 9 years old, he and his mother joined his father there. (*Id.*). The Zhao family moved to Australia in hopes of achieving a better life, particularly for their young son. Mr. Zhao's parents were not formally educated and they dreamed of sending their son to college. Mr. Zhao's father worked as a mechanic and his mother packed boxes for a non-profit company. (*Id.*). They were industrious workers who scrimped and saved for their only son's future education.

Now, Mr. Zhao serves as his parents' main support in their old age. As Ms. Wang described it, Mr. Zhao is his parents' "backbone" and the "pillar of his family." (Ex. A, Julie Wang Letter to the Court at 1). Both of his parents' health is failing: Mr. Zhao's father suffers from a "long term back injury," while Mr. Zhao's mother was diagnosed with Parkinson's disease several years ago. (*Id.*). Due to his parents' declining health, Mr. Zhao shoulders the "major household workload for his family." (*Id.*). According to Mr. Zhao's close friend, Yuetian Sun, Mr. Zhao "takes care of most of [his parents'] problems for them from installing new apps to arranging their finances." (Ex. C, Yuetian Sun Letter to the Court at 1). Mr. Zhao is a "very good son" who "goes back at least twice a week to his parents to check up on them." (*Id.*).

It is with a heavy heart that Mr. Zhao has observed his parents' anguish at his arrest and prosecution in this case. As Ms. Wang stated, "the mistake [Mr. Zhao] has made is a shock to me and to both of our families," and the "pain and burden that have been created is not measurable." (Ex. B, Julie Wang Letter to the Court at 2). Mr. Zhao feels that his arrest has "tainted" his family's otherwise virtuous record in Australia. Mr. Zhao is keenly aware of the sacrifices his parents made

for him during his childhood so that he would have a better life in Australia. He feels his parents, who have done so much for him, do not deserve to have to bear the humiliation of seeing their son detained in custody for 10 months:

> The arrest and prosecution has had detrimental effects on my family and my personal life; as the only child of my family, the impact is far greater than what I have expected, not only psychologically but also financially. I felt regret and despair to see both of my parents in their 60s nearing the end of their working career having to bear the impact of my wrongdoing. My mum has Parkinson Disease and this impact has definitely not done any good for her. My family has had a clean history on criminal record and obeys the law at all times. My action has simply tainted this and I feel ashamed and regret for my wrongdoing.

(Ex. A, Zhao Letter to Court at 2).

**A. Mr. Zhao's Education and Career**

Mr. Zhao made the most of the academic and professional opportunities available to him in his adopted country of Australia. He threw himself into his academic studies, knowing it was his parents' dream for him to graduate from college and find a professional career, something they had never been able to achieve in Shanghai. Mr. Zhao graduated from Sydney Boys High School in 2005. (PSR at 12). He studied finance and accounting at the University of Sydney and earned his Bachelor's Degree in Commerce in 2008. (*Id.*).

In March 2009, Mr. Zhao began employment as a trader at Propex, a proprietary trading firm in Sydney, Australia. (*Id*. at 6, 12). Mr. Zhao worked at Propex for nine years, until his arrest in this case. (*Id.*). As a Propex trader, Mr. Zhao traded futures contracts, including the E-mini S&P futures contract on the Chicago Mercantile Exchange ("CME"). (Id. at 6). Mr. Zhao's fiancé describes him as a capable and dedicated worker:

> My view on Jim is that he is extremely hard working, very devoted to his career. He sometimes works up to 16 hours a day, he is certainly not a man who likes to take shortcut or gives up easily.

(Ex. B, Julie Wang Letter to the Court at 1). And Mr. Zhao's close friend Jerry Lee, with whom he ran a small business, noted that Mr. Zhao is "one of the most honest and hardworking person I've had the pleasure of working with." (Ex. D, Jerry Lee Letter to the Court at 1). According to Mr. Lee, Mr. Zhao is someone who "prefer[s] steady growth over what appear[s] to be shortcuts to success." (*Id.*). Mr. Zhao is "always open and fair."

**B. Mr. Zhao's Devotion to His Friends and Fiancé**

Mr. Zhao has been a supportive and loyal fiancé and friend, as demonstrated by the letters submitted to the Court. He has been a dedicated, longtime partner to Ms. Wang. She describes Mr. Zhao as "the first person in my mind whenever I am [in] need [of] help." (Ex. B, Julie Wang Letter to the Court at 1). Ms. Wang relies on Mr. Zhao's guidance and advice in her personal and professional life: "he always encourages me and reminds me that I should learn from previous mistakes." (*Id.*). Mr. Zhao demonstrated his caregiving skills when Ms. Wang became ill:

> In 2017 winter, I caught cold and high fever. Jim took extremely good care of me. He drove me to see doctor, reminded me of taking medicine, and cooked congee and dinner till I recovered.

(*Id.*). In sum, Ms. Wang views Mr. Zhao as an "inspirational, dependable young man [who] can be entrusted for life." (*Id.*).

Mr. Zhao's close friends echo Ms. Wang's sentiments regarding Mr. Zhao. Mr. Lee states, "[i]n all my time of knowing him, he has always been any honest, hardworking and generous person and I continue to call him a dear friend to this day." (Ex. D, Jerry Lee Letter to Court at 1). Ms. Sun describes Mr. Zhao as a "kind and warm-hearted person." (Ex. C, Yuetian Sun Letter to the Court at 1). She notes that Mr. Zhao's friendship has extended not only to her, but to her parents as well:

> [w]hen my parents who speak limited English moved to Australia, Jim helped me out greatly by taking my parents to their English school and sometimes medical checkups. I only asked him to drop them off, but he accompanies them to make sure they arrive at their destination and became their translator when needed.

(*Id.*).

Mr. Zhao's support and devotion extends beyond his immediate circle of friends and family. As Mr. Lee explained, from a "young age," Mr. Zhao "has had a big heart and was always willing to support those who were less fortunate." (Ex. D, Jerry Lee Letter to Court at 1). To take just one example, Mr. Zhao was the top fundraiser in a campaign to raise funds for the Children's Medical Institute:

> Braving the extreme Australian heat, he went from person to person in the Sydney Central Business District, enthusiastically soliciting donations and selling merchandise. He was the top fundraiser out of a group of approximately 100 volunteers, and the lead organiser exclaimed that his passion and result was above and beyond what she had ever seen from a volunteer.

(*Id.*).

## III. THE OFFENSE CONDUCT

Mr. Zhao's offense conduct is accurately set forth in the plea agreement and PSR. The following is intended to provide context for Mr. Zhao's trading activities that form the basis of the charges against him. Specifically, while Mr. Zhao candidly acknowledges that he engaged in the practice of spoofing, he did not do so in order to generate profits for himself. Indeed, Mr. Zhao "profited minimally" (Sentencing Recommendation at 2) from his spoof orders, which generated a mere $21,000 in trading gains to Mr. Zhao over a period of almost three years (PSR at 6).

Mr. Zhao placed so-called "spoof orders" as a practical means of quickly closing out large positions before lunchtime or at the end of the trading day. Mr. Zhao fully understands that he was wrong to engage in spoofing and takes full responsibility for doing so. As Mr. Zhao explains:

> The reason why I placed large orders on either side of the market was simply trying to close out my existing position and walk away from the trading desk. Having an open position and not monitoring it is not recommended by my company because it may carry unexpected risk during that period of time.
>
> Most of the time during quiet sessions of S&P E-mini, the market will not move at all and waiting for the actual closing of a position may take hours and hours. Sometimes just to save time so I can grab a quick lunch, I often placed those large orders so I can execute quickly and not have to wait for that time period. This is not a strategy I use to make money but more or less to close out a position quickly so I can save some time.

(Ex. A, Zhao Letter to Court at 1). Thus, Mr. Zhao executed spoof orders to "save some time," rather than to generate trading gains for himself.

This case thus stands in stark contrast to other spoofing cases in this District in which the defendants were accused of accumulating massive gains from spoofing. *See, e.g., United States v. Sarao*, 1:15-CR-75, Plea Agreement, Dkt. No. 62, at p. 13 (Nov. 9, 2016) ("[D]efendant SARAO made at least $12,871,587.26 in unlawful gain from trading opposite his Spoof Orders."); *United States v. Coscia*, 1:14-CR-551, Indictment, Dkt. No. 1, at p. 4 ("As a result of this strategy, COSCIA made approximately $1,592,867."). Acknowledging that Mr. Zhao's conduct resulted in minimal gain, the Probation Office concluded that "this matter appears to be a fraud case that falls squarely outside of the heartland of what can be considered 'average.' The defendant, unlike many defendants who engage in fraudulent activities, profited minimally. Moreover, the defendant did not engage in the instant offense in order to support a lavish lifestyle." (Sentencing Recommendation at 2).

## IV. AFTERMATH

Mr. Zhao has already been severely punished for his misguided spoofing trading activity. He spent ten months in detention in Australia, enduring rough conditions and uncertainty over

whether or when he would be extradited to the United States. During his time in detention, Mr. Zhao witnessed his parents' heartbreak at his incarceration and felt their anguish over the real possibility that he would be extradited thousands of miles away.

As the government and the Probation Office acknowledges, Mr. Zhao has already begun taking steps to atone for his misconduct. Shortly after he arrived in the United States, Mr. Zhao participated in a proffer session in which he was fully candid with the government regarding his trading activities. Mr. Zhao's information was instrumental in the government's broader investigation into Mr. Zhao's former employer, Propex.

**A. Mr. Zhao's Detention in Australia and Extradition to the United States**

Mr. Zhao spent a terrifying 10 months in an Australian detention facility awaiting his extradition to the United States on the charges in this case. Following the filing of a criminal complaint and issuance of an arrest warrant in the Northern District of Illinois on January 11, 2018, Mr. Zhao was arrested in Sydney, Australia, on January 29, 2018. (PSR at 4). Ten months later,[1] on November 16, 2018, Mr. Zhao was extradited to the United States in the custody of U.S. Marshals. (*Id*.). Mr. Zhao was granted pretrial release but placed on home confinement on November 26, 2018. (*Id*.). Mr. Zhao entered a plea of guilty to a 1-count information on December 26, 2018, and thankfully with the government's acquiescence, the Court allowed him to return to Australia where he has remained pending sentencing. (*Id*. at 4-5).

Mr. Zhao's ten months of detention in Australia was a truly frightening experience -- he was transferred from facility to facility; he shared a cell with threatening cellmates; and he was unsure of when or where he would be released from custody. And when he was finally extradited

[1] Mr. Zhao was in custody for 302 days, from January 29, 2018 through November 26, 2018. (Government's Version of the Offense at 10).

to the United States ten months later, Mr. Zhao was alone and confined to a hotel room in a strange city, cutoff from meaningful contact with those he loved, uncertain and fearful of what the future held.

Mr. Zhao describes the terror and panic he experienced when he was held in detention pending his extradition:

> It was an absolute shock to me, throughout my whole life I have never been in this position before. My first day was locked in a small room with no lights or anything around me, the only thing I can hear was people yelling on the other side of my room, I can feel a sense of despair and desperation. The next day I was transferred to a new correction centre, I was allocated to a room with a random man next to me, he was a drug addictive, often wakes up middle of the night and takes a shower, I was not dare to complain, simply afraid and not knowing what to do. I was not allowed to make any contact with my family in the first week. I was simply living in despair without knowing what the future lays ahead.
>
> The week after I was further moved to a new correctional centre, when I first walked into the cell, I saw dozens of cockroaches on my bed, the room was also filled with bad odour, and perhaps no other word but a dungeon was the best way to describe the place. Everyday our cell was locked after 3pm, which then last for 17 hours everyday for the next 10 months. Even right now, it is terrifying to think the ordeal I had for those 10 months.

(Ex. A, Zhao Letter to the Court at 1). Mr. Zhao refers to his time in detention in Australia as the "worst days of his life." (*Id*. at 2).

Mr. Zhao's time in custody was made even more difficult by the impact of his detention on his fiancé and his parents. Mr. Zhao suffered great anguish upon witnessing his parents' reaction to his incarceration:

> when I saw my mother with her shivering hands touching my face, my heart was broken that instant, I held my tear because I don't want to give them more stress which I feared they may not able to handle.

(*Id*.). Seeing his fiancé while he was in detention was equally distressing for Mr. Zhao:

> The first person I contacted was my fiancée, Julie, I lost my word for the first few minutes and we simply just hugged each other, even though it was only few weeks of not seeing each other, the feeling was lot longer.

(*Id.*).

Mr. Zhao is painfully aware of the "terrible effects" of his arrest and prosecution on his beloved parents:

> as the only child of my family, the impact is far greater than what I have expected, not only psychologically but also financially. I felt regret and despair to see both of my parents in their 60s nearing the end of their working career having to bear the impact of my wrongdoing. My mum has Parkinson Disease and this impact has definitely not done any good for her. My family has had a clean history on criminal record and obeys the law at all times. My action has simply tainted this and I feel ashamed and regret for my wrongdoing.

(*Id.*).

**B. Mr. Zhao's Cooperation with the government**

As the government acknowledges, Mr. Zhao fully cooperated with the government following his extradition, and his cooperation has been instrumental in the government's investigation into Mr. Zhao's former employer, Propex. Mr. Zhao "began cooperating with the U.S. authorities shortly after his extradition to the United States." (Government's Version of the Offense at 10). On December 4, 2018, barely two weeks after he arrived in this District on November 19, 2018, Mr. Zhao met with the government for a lengthy and detailed proffer session. (*Id.* at 11). "In that session, [Mr. Zhao] candidly acknowledged his unlawful trading activity and took full responsibility for his crimes." (*Id.*); *see also* PSR at 7 ("Special Agent Nevens explained that the defendant participated in a proffer session, he answered all questions asked of him and provided full and truthful information."). Moreover, Mr. Zhao's "cooperation has substantially informed the government's investigation of Propex regarding the company's operations and liability for the defendant's trading activity while a Propex employee." (Government's Version of

the Offense at 11). Thus, the government will recommend a downward departure from the applicable sentencing guideline range pursuant to Guideline § 5K1.1. (Plea Agreement ¶14).

## V. MR. ZHAO'S SENTENCING REQUEST

The Court is well-acquainted with the provisions of 18 U.S.C. § 3553, which set forth both the purposes of sentencing as well as the factors to consider in arriving at a sentence "sufficient, but not greater than necessary to serve the purposes of sentencing." *Gall v. United States*, 552 U.S. 38, 47 (2007). The Supreme Court has instructed that the district court should use its ample discretion to fashion a sentence so that the punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229 (2011) (citations omitted). Moreover, it is the sentencing court's decision as to what weight to place on any one of the Section 3553 factors. Finally, the Supreme Court has rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.*; *see also United States v. Johnson*, 471 F.3d 764, 766 (7 Cir. 2006) ("[T]he statute does not weight the factors. That is left to the sentencing judge, within the bonds of reason, which are wide.").

For this defendant under these circumstances, a sentence of time served as recommended by the Probation Office (or a sentence of one year and one day, with credit for time served, resulting in no further period of incarceration) most certainly accomplishes the goals of both punishment and deterrent effect.[2] Mr. Zhao has already been severely punished through his ten

---

[2] A number of courts have found a sentence of time served to be necessary to satisfy the purposes of sentencing, even when the advisory Guidelines called for far greater terms of imprisonment. *See, e.g., United States v. Gohil*, 325 F. Supp. 3d 936, 940 (E.D. Wis. 2018) (imposing sentence of time served though the Guidelines called for a term of 33-41 months); *United States v. Teague*, 2018 WL 6061390, at *6 (S.D. Ill. Nov. 20, 2018) (imposing sentence of time served where Guidelines called for a term of 41-51 months); United States v. Szanto, 2007 WL 3374399, at *5 (N.D. Ill. Nov. 8, 2007) ("[T]he court, in its discretion, believes that the appropriate sentence is one of time-served, or just under 24 months."); *United States v. Collado*, 2008 WL 2329275 (S.D.N.Y. 2008) ("I have determined that an incarcerative sentence would be

months' incarceration in Australia and extradition to the United States. The terrorizing effect on Mr. Zhao of being involuntarily deported from his home country cannot be overstated. Such a sentence is also appropriate because: (1) the offense conduct clearly falls well outside the heartland of spoofing cases; (2) Mr. Zhao did not engage in the offense conduct to generate gains for himself, for example to support a lavish lifestyle; (3) there is no dispute that the offense conduct constitutes the lone blemish on Mr. Zhao's otherwise exemplary life; and (4) Mr. Zhao fully cooperated with the government in its investigation.

Mr. Zhao is a good, hard-working person who has been deeply traumatized by his arrest and prosecution in this case. We urge the Court to impose a sentence that would not require Mr. Zhao to spend another day in custody and would instead allow him to immediately return to Australia.

Dated: January 21, 2020

Respectfully submitted,

/s/ Theodore T. Poulos
Attorney for Defendant Zhao

Theodore T. Poulos
Emily C.R. Vermylen
Cotsirilos, Tighe, Streicker, Poulos & Campbell
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

---

inappropriate and that the sentence [] will consist of time served and three years' supervised release with certain conditions, 200 hours of community service and a $100 assessment.").